36 So.2d 244

## BLACKSHEAR v. STATE.

### 4 Div. 29.

Court of Appeals of Alabama.

April 20, 1948.

Rehearing Denied May 18, 1948.

Richard T. Rives, of Montgomery, J. W. Hicks, of Enterprise, and Douglas Brown, of Ozark, for appellant.

A. A. Carmichael, Atty. Gen., and Jas. T. Hardin, Asst. Atty. Gen., for the State.

HARWOOD, Judge.

This appellant James Durwood Blackshear and his brother, Julian Blackshear, were indicted for murder in the first degree because of the killing of James Ralph Andrews. Julian Blackshear demanded and was granted a severance. The appellant's jury trial resulted in a verdict of guilty of murder in the second degree and his punishment was fixed at imprisonment in the State penitentiary for a term of twenty years.

On 7 March 1947, at about 10:30 A.M. the appellant and his brother Julian were riding in a truck, the appellant driving. They turned from a side street onto the Bee Line Highway in the Town of Pinckard and as they were driving east through the business section of the town they were observed by the deceased who was then in a grocery store and meat market which he operated. The deceased came out of his business place and flagged the two brothers down. It is clear from the evidence that the deceased at this time wanted to interview the appellant about two bad checks that appellant had given him. The appellant pulled over and stopped his truck in front of the deceased's store. From this point on the evidence presented by the State and by the defense is in considerable conflict as to what transpired.

Evidence introduced by the State tended to show that earlier on the morning of the killing the appellant and his brother Julian visited the City of Dothan where, after first procuring money from State's witness John Lay, and further funds from a check cashed by appellant, the appellant purchased a 45 calibre automatic pistol with ammunition therefor. It was this pistol with which deceased was killed.

It was also shown by the State that during their wanderings on the morning of the killing, that inquires were made by one or the other of the brothers as to the whereabouts of certain members of the Andrews family, and that during this time while they were at the home of State's witness Jim King statements were made to him that they intended to kill all the Andrews, starting with the head of the family, James Ralph Andrews, the deceased.

As to the facts immediate to the killing, the State's evidence was directed toward showing that after appellant had stopped his truck as above mentioned that he and deceased engaged in conversation. During this time Julian, who was under the influence of alcohol, got out of the truck and attempted to interject himself into the conversation several times. The deceased would then push Julian away. Upon Julian pulling an open knife the deceased went to the side of his store and procured a piece of metal pipe and a wooden stick which appeared to have been a broom handle. The pipe and handle are each about 30 to 34 inches in length. With the pipe in one hand and the handle in the other the appellant advanced on Julian. According to some of the witnesses for the State neither of these weapons was carried by the deceased in a striking position. When deceased got near Julian the appellant was at his back, then according to Mrs. Andrews, deceased's widow, "Durwood" (appellant) "ran up to his back and I hollored and said Durwood has a gun in your back, and I hollored another time, and the third time I said, Durwood, don't shoot that gun, and the third time I hollored, Ralph, Durwood has a gun in your back, that time Ralph saw him and he dropped the sticks down like this, and he fired on him * *."

Some of the witnesses for the State testified that they heard appellant call to deceased to stop before he shot him.

Mrs. Andrews testified on cross-examination that as the deceased was returning toward Julian, after having procured the pipe and handle that "he looked excited, he was pale."

According to several witnesses for the State the deceased was several steps from the appellant when he shot.

For the defense the appellant testified in his own behalf. His statement of the immediate occurrence fairly summarizes

the main evidence presented by the defense and we quote his account of this killing as shown by the record:

"A. Ralph said, Durward, [Sic], I have still got those two checks, and I said, All right, Ralph, just as quick as Shelley gets a check for the cows we sold down at the sale in Dothan yesterday I will either send the money back by Shelley this afternoon or I will bring it back myself, and he said, All right, Derr, and he said, Can I use your boat Sunday to break in my new out board motor, and I said, sure, and he said, Where is it, and I said it was at 822 Dusy Street in Dothan, and Ralph said, Where in the hell is that, and I told him. He thanked me for the use of the boat and asked me did I want him to bring it back to Pinckard or leave it back there where he got it from, and I told him it didn't make any difference. Then he turned to my brother Julian who was sitting on my right and said, Dock, what are you and papa going to do about that case coming up in court tomorrow? And my brother Julian said, Ralph, I am not going to do anything about it except maybe be a witness, I was with him, and he said, Hell, that ain't what I was talking about, I am talking about paying half of the fine and fixing up those cars, and Julian said, Wait a minute, Ralph, I am not going to pay any fine or any part of it, and Ralph said, You were with him and if you don't help him pay it I will have it all to pay, and Ralph opened the right hand door of my pick up truck and said, Get out, and Julian got out, and Ralph began to shove Julian backwards in the chest with his left hand and he said, If you don't pay half of papa's fine tomorrow or promise me that you will pay half of it today I am going to stomp hell out of you right now. Ralph had shoved Julian back over towards a car that was parked there, and Julian said, Ralph, you will just have to stomp because I am not going to pay any part of it. Ralph turned and went around the front of the car that was parked there and went past the door to his market to the corner of the building and picked up an iron pipe in his right hand and a piece of broken broom handle in his left hand and came back around the back of that car. I slid out of my pick up truck on the right hand side and met Ralph at the back of this car and I said, Ralph, don't bother Julian with that pipe and let us go on. Ralph went by me and I could see he was mad and he went over to Julian and he raised the pipe back up over his head and said, Goddamn you, if you don't pay half of that fine I will bust your brains out. I went over to my pickup truck and reached in the dash pocket and got my gun. Ralph didn't even look towards me. I hollered again and said, Ralph, drop that pipe. Ralph whirled his head and looked at me and reached down and got his belt up with his elbows and came on me with the pipe raised up with the stick down. I said, Ralph, stop! and he didn't stop and I stumbled backwards and tried to back up, and Ralph came on within just a few feet of me and I screamed at the top of my voice and he said, Goddamn you, I will kill you. * * *

"A. I hollered for him at the top of my voice to stop, and he didn't stop and I shot him."

Appellant's account is substantially corroborated by the testimony of Julian, and to some extent by other defense witnesses.

Both appellant and Julian denied having made threats toward the Andrews family to State's witness Jim King.

The appellant and Julian also testified that the pistol had been procured by appellant because appellant was going on a fishing trip to Choctawhatchee Swamp in Florida and needed the pistol with which to kill snakes.

It further appeared from defense evidence that the appellant had a cork leg, and that the bone had been taken from the heel of his remaining foot and replaced by silver. Witnesses for the State testified however that appellant's ability to walk and get about did not appear to be seriously impaired.

█ It is our opinion that the evidence presented by the State, if believed under the required rule, sufficiently established the essential elements of murder in the second degree and that the jury's verdict finding the appellant guilty of that degree of homicide was justified.

For the State Mr. Jim King testified that on the morning of the killing, and preceding it, the appellant and Julian, who are his first cousins, came to his home to inquire about a cattle transaction. Julian was very drunk at this time, and staggered about, while the appellant was sober. The appellant had a pistol in a scabbard on his left side under his jacket. Julian attempted to take this pistol from appellant several times, but appellant did not let him have it.

During the conversations between this witness and the Blackshear brothers on this occasion this witness testified that Julian had said in the presence of the appellant, "We are going to kill all of the Andrews today and we are going to start with the head and come down, and Ralph is the head," and that as the two brothers left the appellant had said to him "Remember Jim, this is my last day out, I have never heard any of the Andrews speak hard of you in any way." According to this witness, and in connection with the above statement of the appellant, Julian had told him that Ralph Andrews, the deceased, had "laughed at me and talked hard of me at my back."

On cross-examination the defense attempted to show bias on the part of this witness, and the record discloses the following:

"Q. Have you ever had any trouble with Durward and Julian prior to this time? A. No, sir; never in my life.

"Q. You never have had any trouble? A. My son and Durward had a fight one time.

"Q. Just answer my question. I will come back to the fight. Have you ever had any trouble with them? A. No, sir.

"The Court: He has answered that at least three times.

"Q. Have you ever drawn a knife and threatened to cut Julian Blackshear's throat? A. No, sir. I did Durward one time when he got a rock to throw at me.

"Mr. Brown: We ask that the witness be instructed by the Court to answer the question, and we move to exclude the voluntary statement of the witness.

"The Court: It goes out, any voluntary statement not responsive to the question.

"A. We have been friends all through the years.

"\* \* \* \* \* \*

"Q. Just answer my question and we will get through with you in a few minutes. Did you about 15 years ago threaten Julian with a knife? A. No, sir.

"Mr. Borders: We object.

"The Court: He answered, no.

"Q. Did your son, Elton, about 15 years ago have a fight with Durward and Julian?

"Mr. Borders: We object.

"The Court: Sustain the objection.

"Mr. Brown: We except to the ruling of the Court. We expect to show by the witness that he had a fight with them and he has ill will and bias towards this defendant.

"Q. As a matter of fact, prior to the time you had a fight, or Elton had a fight with them, you visited almost daily in Dr. and Mrs. Blackshear's home, didn't you? A. I did.

"Mr. Borders: We object. There is no testimony in reference to a fight with them.

"The Court: Sustain the objection.

"Mr. Brown: We except to the ruling of the Court, and we expect the witness to state he did visit them prior to this fight almost daily.

"Q. Since the date of that fight that Elton had with Julian and Durward and you entered into you have not been in Dr. and Mrs. Blackshear's home but on two or three occasions, is that right?

"Mr. Borders: We object.

"The Court: Sustain the objection.

"Mr. Brown: We except to the ruling of the Court, and we expect the witness to answer that he has been there only on two or three occasions."

■ The guiding legal principles pertaining to the scope of permissible cross-examination of an adverse witness to show his bias or prejudice are clearly stated and summarized by Justice Simpson, now of the Supreme Court, then a member of this court, in Sowell v. State, 30 Ala.App. 18, 199 So. 900, 901. Writing to this point Justice Simpson said:

"Generally, anything which tends to show bias or inclines the witness to swear against a party is relevant for impeachment. Louisville & N. R. Co. v. Courson, 234 Ala. 273, 174 So. 474, 476; Nelson v. State, 11 Ala. App. 221, 65 So. 844; Pelham v. State, 22 Ala.App. 529, 530, 117 So. 497; Byrd v. State, 17 Ala.App. 301, 302, 84 So. 777.

■ "Hostile feeling shown to be malignant, reflects greater discredit to the witness than that generated by a sudden quarrel. So, proper inquiry is allowed to test the extent of the hostility of such witness. Legitimate cross-examination to elicit such proof is proper. Fincher v. State, 58 Ala. 215, 220.

■ "Upon such inquiry, any circumstance which might reasonably show bias or hostility is admissible upon cross-examination for consideration of the jury. 2 Wigmore on Evidence, 2nd Ed., Section 948, 949, 950. This principle was skilfully dealt with by Mr. Justice Thomas of our Supreme Court in Adler v. Miller, 218 Ala. 674, 679, 120 So. 153, and excellently restated by Mr. Chief Justice Gardner of that court in Louisville & N. R. Co. v. Martin [240 Ala. 124], 198 So. 141, 144. And so well set forth in these cases (quoting Wigmore, supra, Section 949, p. 332): 'The range of external circumstances from which probable (probably) bias may be inferred is infinite. Too much refinement in analyzing their probable effect is out of place.'

"It is also a part of our statute law that every party has the right of cross-examination, thorough and sifting, of the witnesses who testify against him. Code 1923, Section 7731 [Code 1940, Tit. 7, § 443]."

■ In the present case the State's witness was a first cousin of the appellant and the witness Julian Blackshear. Julian was residing in the home of his father, Dr. Blackshear, at the time of this homicide. Mr. King's testimony as to threats made by Julian, in appellant's presence, on the occasion of the visit of the Blackshear brothers to King's home on the morning of and preceding this shooting was greatly adverse to the defendant. If believed by the jury under the required rule it could not but result in prejudice to the defendant's cause. King was undoubtedly one of the principal witnesses for the State. The extent to which a witness may properly be cross-examined as to collateral circumstances tending to prove his bias or interest must be considered in the light of the status of the importance of witness' testimony in relation to the entire picture of the prosecution's case. Adams v. State, 30 Ala.App. 188, 2 So.2d 468.

■ In view of the relationship of Dr. and Mrs. Blackshear to the appellant and Julian Blackshear it is our opinion that whether the witness King, a close relative to the Blackshears, had over a period of years practically discontinued his visits to the Blackshear home after a difficulty with one of the Blackshear sons was highly relevant in its tendency to show bias toward the Blackshears.

This court is convinced that the action of the trial court in cutting off the defense's attempt to show this bias by sustaining the State's objections to questions tending to show the existence of bias was seriously prejudicial to the appellant's cause and erroneous.

■ It also appears from the record that during the cross-examination of the defense witness Julian Blackshear the court overruled the defense's sufficiently grounded objection to the following question: "Julian, on December 2, 1941, you plead guilty to a violation of the internal revenue Act and were put on five years probation, were you not?"

Under Sections 434 and 435, Title 7, Code of Alabama 1940, a witness' credibility may be tested by examining him as to prior convictions for offenses involving moral turpitude. (See cases cited under above mentioned Code Sections.)

There was no showing by the State as to the character of the offense for which the above witness was convicted, or that it was one involving moral turpitude, other than a statement volunteered by the special prosecutor that the offense for which Julian had been convicted was a felony and carried a ten year sentence. Statements by counsel unsupported by any other evidence, documentary or otherwise, cannot be regarded as evidence. The sentence imposed affords

no ground for such an inference, as was the situation in Dickey v. State, 32 Ala.App. 413, 26 So.2d 532, nor does describing the offense as a violation of the Internal Revenue Act. Acts constituting a violation of the Federal Internal Revenue Acts are innumerable, and range from rather minor misdemeanors to serious felonies. We of course do not know just what internal revenue act the witness did violate. While violation of the internal revenue acts regulating the manufacture and taxing of alcohol beverages are commonly referred to as a violation of the Internal Revenue Law, conviction of this type of violation of said Act clearly cannot be shown under the settled doctrine of our decisions. Lakey v. State, 206 Ala. 180, 89 So. 605; Pinkerton v. State, 31 Ala.App. 599, 20 So.2d 604, and cases therein cited.

It is our opinion therefore that the trial court erred in overruling the objection to the above question propounded to the witness Julian Blackshear.

It is our opinion that the above discussed points, which in our opinion involved erroneous rulings, necessitate a reversal of this cause. Several other points are raised in the appellant's brief. We do not think they are likely to arise in another trial of this case. We therefore pretermit consideration and comment in the interest of brevity.

This cause is therefore ordered reversed and remanded.

Reversed and remanded.